GURLEY v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

DIVISION TWO.

1. **Railroad:** FOOTWAY: PUBLIC CROSSING. The public use of a footway as a crossing over a railroad track, with the acquiescence of the company, does not convert it into a public crossing within the meaning of Revised Statutes, 1889, section 2608.

2. ———— : ———— : ————. Nor does such use and acquiescence devolve upon the company the duty of maintaining the footway as a public crossing and of keeping it open and unobstructed, subject to the statutory penalties for failure to do so.

3. ———— : ———— : NEGLIGENCE. The company cannot, however, because such way is not a public crossing negligently and recklessly run its cars over persons who are in the habit of using it as a crossing.

4. ———— : ———— : ————. If it discovers such person on said crossing, it is its duty to use every precaution to prevent injuring him.

| | |
|---|---|
| 104 | 211 |
| 48a | 85 |
| 104 | 211 |
| 112 | 251 |
| 51a | 109 |
| 104 | 211 |
| 119 | 271 |
| 104 | 211 |
| 121 | 12 |
| 122 | 145 |
| 123 | 241 |
| 123 | 248 |
| 123 | 260 |
| 60a | 210 |
| 104 | 211 |
| 147 | 158 |
| 148 | 79 |
| 104 | 211 |
| 6166 | 444 |
| 166 | 445 |
| 104 | 211 |
| 172 | 9190 |
| 96a | 6678 |

5. Negligence: OPENING BETWEEN CARS: IMPLIED INVITATION. Where a railroad company was in the habit of making an opening in its trains at a point on its track to enable the public to cross and a traveler on coming to said crossing found the cars so separated as to induce him and the public to believe that the company intended that it should be used for a crossing, and he did so believe, then he was justified in acting on such implied invitation and the company owed the duty, under the circumstances, of giving him some reasonable or suitable warning of its intention to close the opening, and would be liable if it neglected to do so, and because of such neglect he was injured while passing through.

6. ——— : ——— : ———. Where, however, the railroad, in such case, had placed its cars in such close proximity that it was dangerous or hazardous for anyone to pass between them, and it would appear to a reasonably prudent man that the company did not intend the public should use said opening as a crossing then the implied invitation to pass was revoked and a traveler is not justified in risking himself between the cars.

7. Evidence: INCREDIBLE STATEMENT. A statement in evidence may be so contradictory of general knowledge that no court is bound to believe it.

8. Verdict: EXCESSIVE DAMAGES, PRACTICE IN SUPREME COURT AS TO. The supreme court will not, because the damages awarded by the verdict of a jury are excessive, indicate a sum to be remitted so that on such *remittitur* being entered judgment may be affirmed as to the residue.

9. ——— : ———. Such excessive verdict will not be disturbed by the supreme court, unless, on its face, it appears to be the result of passion or prejudice, and where it does so appear to be the result of passion or prejudice it will be set aside entirely.

*Appeal from Cass Circuit Court.*—HON. C. W. SLOAN, Judge.

REVERSED AND REMANDED.

THIS is an action for damages based upon the alleged negligence of defendant in carelessly and negligently driving and forcing certain loose cars on its house or sidetrack, in the town of Pleasant Hill, Missouri, against some stationary cars, near a crossing on said track, whereby the plaintiff was, without warning, caught

between the cars on the crossing, and the fleshy portion of his thigh mashed.

The answer was a general denial, and further alleged that said crossing was not the only means of access for footmen to defendant's said depot or platform at the northerly end thereof; but defendant avers that the truth is that said crossing was not a public one, but only a private path or footway across one of its tracks in Pleasant Hill, for the use of the employes of defendant; that defendant's said depot at Pleasant Hill is located between two streets, laid out nearly parallel with each other, and crossing the tracks of defendant; that it has a platform upon which persons having business with it at its said depot approach the same, to which platform its depot is connected, extending to each of said streets; that the north boundary of the street on the south side of its depot is a short distance from where plaintiff attempted to cross the track, as alleged in his petition; that plaintiff had resided for many years in the city of Pleasant Hill, and was well acquainted with the locality, and knew, or ought to have known, that the two streets aforesaid were such crossings as are contemplated by the statute, and that the place where he received his alleged injuries was not such a crossing.

And defendant further avers that said plaintiff knew, or ought to have known, that the track over which he attempted to cross and received his alleged injuries, as stated in his petition, and lying between the streets aforesaid, was daily and habitually used by defendant as a sidetrack for its trains to pass each other, and upon which to make up trains, and for the temporary storage and loading of its cars, without giving any signal or warning; that the space between the cars, between which plaintiff attempted to cross, was a narrow one, the said cars being close together, with barely room for a person to pass between them; and defendant avers that the said plaintiff, in attempting

to pass between the said cars under the circumstances and surroundings hereinbefore set forth, voluntarily took upon himself the risk of such attempt, and any injuries which he received thereby were caused in whole or in part by his own negligence and carelessness, which directly contributed thereto.

Evidence : The evidence introduced by plaintiff tended to show that about the years 1865 or 1866 the then owner of the Planters' House, a Mr. Brown, laid two planks from his house to the depot, for the convenience of the boarders at his house. About the year 1872 Mrs. Henry took the house, and it was used as an eating house for defendant, and it had a walk from the hotel to the depot platform for the convenience of its patrons. In 1875 the house was abandoned for this purpose, and the Atlantic House was used as an eating-house by the railroad company ; that the proprietor of the Planters' House, for his own convenience, took up and relaid the walk, and kept it in repair after the eating-house was changed to the other hotel ; that from the Planters' House to the depot, by way of this walk, was thirty steps nearer than to go by the way of the public street and walk ; that the depot is constructed between Wyoming and Commercial streets in Pleasant Hill, which are parallel with each other, and the depot platform on the south, extending from one street to the other ; that there was at that time an open space between the two streets north of the depot, where people could and did cross the tracks ; that the track at which the injury occurred was north of the depot, and was a switch called the house or team and delivery track, where for years all the transfers were made, change of freight, loading and unloading, and where those cars were made up into trains, and was used sometimes as a passing track ; that the defendant was continuously setting cars on that track, and taking them out ; that the crossing was closed a great deal of the time by cars standing across it ; that it was not a public road or crossing, but

a private one, and was kept open or closed as the busi-ness of the defendant demanded.

This track had a descending grade from Wyoming street towards the crossing, and plaintiff's evidence dis-closed the fact that boys had frequently been seen to take off the brake on the cars standing thereon, and they would start and run down the track by their own weight. The plaintiff's evidence tended to show that just before the injury cars were seen moving in the yard west of Wyoming street, and were kicked in on this switch track by an engine in the yard. No one, however, saw the accident but plaintiff and his son. One of the plain-tiff's witnesses testified that he had just crossed between the cars when he met the plaintiff going towards them ; that the space was so narrow that he was obliged to go through sideways ; that it was such a dangerous place, by reason of the proximity of the cars, that he expected that either he or some one else would get injured there, and as soon as he heard plaintiff halloo he knew he had got hurt.

The plaintiff's son testified that he was with his father when he was hurt; that he (the son), when he got within two feet of the car, stopped and listened. At that time his father was half a foot ahead of him. He saw no engine nor moving cars. He says: "My father went in between the cars before I did. When my father went through I was right behind him. At the time he was struck, I just had my hands on the side of the cars, one hand on each car. I was going through if he got through all right. I concluded I could not get through I thought I would get through if he got through all right."

The plaintiff himself testified that at the time of the trial he was sixty-two years of age, and had lived in Pleasant Hill since 1871 ; that on the twenty-second day of January, 1886, a little after eight o'clock in the evening, he, with his son, started for the defendant's

depot on business of his own, but not with the defendant; that he went on the walk from the Planters' House, and when he got to the track he stopped and looked both ways. Had been "going across railroad tracks a good many years, and it was natural for me to look both ways, and saw no indications of any moving train. Did not hear anything. Heard no signal. After I looked and listened, I started to go through, and it seemed to be instantaneous, for as soon as I got through between the drawheads there was a crash came and the racket seemed to be right upon me." He further testified that he knew the purpose for which the sidetrack was used. He had frequently passed over that walk for a good many years, and frequently passed between the cars. Sometimes the cars were closer together than others. At this time there were two or three feet between the drawheads of the two cars. Plaintiff had passed through between the cars two hours before his injury. He was confined to the house about three months as the result of his injury. His physicians' bills were $165, and expenses for nursing were $51, which he expected to pay when he was able. He was a traveling man, earning $4 or $5 per day, selling on commission before his injury, and could not then make as much.

From the testimony of the physicians examined by plaintiff it appears that the injury consisted of a lacerated wound on the inner surface of the thigh, the deepest part of which was three-quarters of an inch. It involved no bones, but was simply a flesh wound. Dr. Beattie, who was appointed to examine the plaintiff, testified that he discovered a scar in front of plaintiff's thigh, measuring twelve inches in length. There was no injury to the bone, but was confined to the soft tissues. There was nothing to lead the doctor to believe that any muscle was destroyed, but was told by plaintiff that one motion of the limb was impaired; that was

the motion of crossing the limb on the other; that the wound was entirely healed, and that there was nothing in the wound itself that would indicate that plaintiff was then suffering, or that would impair the usefulness of the limb.

The court, in plaintiff's second instruction, told the jury that if they believed from the evidence that defendant erected and maintained, or, after erecting, permitted others to maintain, a public crossing at said point, over its sidetrack, at which persons going to and from said depot were in the habit of crossing said sidetrack, with the permission, consent or knowledge of the defendant's agents, servants or employes; that defendant was in the habit of keeping such of its cars as were not required for immediate use at such points on its sidetrack; that at the time of the alleged accident defendant had some of its cars standing on said sidetrack, at said crossing, some on one side and some on the other side of said crossing; that they were uncoupled thereat and separated so as to permit footmen to pass between them at and on said crossing, in going to and from said depot; that while said cars were so standing and separated at said crossing the plaintiff attempted to pass thereat, for the purpose of reaching said depot; that, at the time plaintiff so attempted to pass between said cars at said crossing, defendant, by its agents, servants or employes, in the use of a locomotive or switch-engine under their control, struck, at the northerly end of said sidetrack, the stationary cars so standing thereon, or struck another loose car standing thereon, and drove them on and against said cars so standing and separated at said crossing, and thereby suddenly, without signal or warning, closing said opening, whereby said cars, at said opening, were driven on and against plaintiff, and he was caught between them, on or at said crossing; and that he thereby, and by reason thereof, received the injuries complained of in his petition—they are instructed that these facts, if

they existed, constitute negligence on the part of the defendant, and will find the issues for plaintiff. The defendant prayed the court to instruct the jury to return a verdict in its favor. The jury returned a verdict for the plaintiff for $15,500, upon which judgment was rendered.

*H. S. Priest* for appellant.

( 1 ) The demurrer to the evidence should have been sustained. The plaintiff was a bare licensee at most ; he was upon his own business for his own exclusive benefit and defendant owed him no duty except that of not wilfully or wantonly injuring him. *Sweeney v. Railroad,* 10 Allen, 368 ; Shear. & Redf. Neg., sec. 499 ; *Hounsell v. Smyth,* 7 C. B. ( N. S. ) 729 ; *Binks v. Railroad,* 32 Law Jour. ( N. S. ) Q. B. 26 ; *Lary v. Railroad,* 78 Ind. 323 ; *Carleton v. Franconia & Co.,* 99 Mass. 216 ; *Harris v. Stevens,* 31 Vt. 79–90 ; *Nurray v. McLean,* 57 Ill. 378 ; *Durham v. Musselman,* 18 Am. Dec. 133 ; *Reardon v. Thompson,* 21 N. E. Rep. 369 ; *Cusick v. Adams,* 21 N. E. Rep. 673 ; *Larimore v. Iron Co.,* 4 N. E. Rep. ( 2 ) Plaintiff's instructions, numbered 1, defining the issue is wrong. ( 3 ) Plaintiff's instruction, numbered 2, is not the law. It introduces an element of recovery not laid in the declaration ; that is, the failure to warn plaintiff of the cars. ( 4 ) The instruction, numbered 3, as to the measure of damages is erroneous. It directs the jury to allow the plaintiff such sum as " you may, from the evidence, believe he ought to recover." Then follow specifications of points of damage in favor of plaintiff, which the jury are told they must take into consideration. It is not the law that the only limitation upon the amount of recovery is the *ad damnum* clause in the petition and what the jury believe the plaintiff ought to have. The jury exercised their unlimited discretion with unbounded generosity towards the plaintiff. ( 5 ) The objection to the introduction of any evidence

under the petition should have been sustained. This was ruled when the case was here before (93 Mo. 445), and the petition was not amended. (6) The language used by the plaintiff's attorney—"that defendant has more power in this country than the Czar of Russia has in his," and its repetition upon objection was an outrageous abuse of fair debate, and was artfully designed to accomplish the excitement of a morbid sentiment in the minds of the jury which would lead them to act unfairly and unjustly towards the defendant. (7) The verdict is unconscionable. It is nothing short of robbery under the guise of legal proceedings. It ought not to be allowed to stand. *Sawyer v. Railroad*, 37 Mo. 240; *Waldhier v. Railroad*, 87 Mo. 37; *Furnish v. Railroad*, 13 S. W. Rep. 1044; *Adams v. Railroad*, 100 Mo. 555; *Sioux City v. Finlayson*, 16 Neb. 578-591; *Collins v. City*, 35 Iowa, 432; *Rose v. Railroad*, 39 Iowa, 256; *Potter v. Railroad*, 22 Wis. 615; *Spicer v. Railroad*, 29 Wis. 580.

*Adams & Buckner* also for appellant.

(1) The defendant's demurrer to the evidence should have been given. There was no evidence of any negligence or carelessness in causing the cars to collide with each other. *Railroad v. Godfrey*, 71 Ill. 500; *Donaldson v. Railroad*, 21 Minn. 293; *Tennbroek v. Railroad*, 59 Cal. 269; *Railroad v. Huffman*, 28 Ind. 287; *Houston v. Railroad*, 95 U. S. 297; *Morrisey v. Railroad*, 126 Mass. 377; *Railroad v. Goldsmith*, 47 Ind. 43; *Mason v. Railroad*, 27 Kansas, 83; *Railroad v. Hammett*, 44 Ohio St. 375; *Railroad v. Aikin*, 130 Pa. St. 38; *Casey v. Railroad*, 15 Ont. 574; *Rogstadt v. Railroad*, 31 Minn. 208; *Stillson v. Railroad*, 67 Mo. 671; *Kelley v. Railroad*, 75 Mo. 138. (2) The court erred in giving the plaintiff's second instruction. *Railroad v. Godfrey*, 71 Ill. 500; *Nicholson v. Railroad*, 41 N. Y. 542; *Sutton v. Railroad*, 66 N. Y. 243; *Railroad v. Marion*, 104 Ind. 239; *Bunker v. Covington*, 69 Ind. 37;

*Railroad v. Depew*, 40 Ohio St. 128; *Finlayson v. Railroad*, 1 Dill. 579. (3) The language used by plaintiff's counsel in his argument was calculated to influence the passions of the jury. It was the duty of the court to check and reprimand counsel in the presence of the jury. *Loyd v. Railroad*, 53 Mo. 509; *Roeder v. Studt*, 12 Mo. App. 566. The damages are grossly excessive. *Sawyer v. Railroad*, 37 Mo. 240; *Waldhier v. Railroad*, 87 Mo. 37; *Furnish v. Railroad*, 13 S. W. Rep. 1044; *Adams v. Railroad*, 100 Mo. 555; *Sioux City v. Finlayson*, 16 Neb. 578-591; *Collins v. City*, 35 Iowa, 432; *Rose v. Railroad*, 39 Iowa, 256.

*R. T. Railey* and *Whitsett & Jarrott* for respondent.

(1) The public had acquired an easement across defendant's sidetrack, and plaintiff was not there as a trespasser at the time of his injury. *State v. Walters*, 69 Mo. 436; *State v. Wells*, 70 Mo. 637; *Zimmerman v. Snowden*, 88 Mo. 220; *State v. Proctor*, 90 Mo. 337; *State v. Bradley*, 31 Mo. App. 318; *Byrne v. Railroad*, 58 Atl. Rep. 512. (2) Plaintiff having been injured at a public crossing for footmen it was the duty of defendant, when approaching said crossing with its train, or cars, to give proper signals and warning, and a failure to do so constitutes negligence. R. S. 1889, sec. 2608; *Crumpley v. Railroad*, 98 Mo. 38. (3) Defendant was bound to give plaintiff and others using said crossing proper and timely warning before closing the same. Its failure to do so was negligence. *Nichols v. Railroad*, 32 Am. & Eng. R. R. Cases, 27-30, and cases cited; *Harriman v. Railroad*, 12 N. E. Rep. (Ohio) 455. Numerous authorities are cited and discussed in this case. *Kelley v. Railroad*, 6 Am. & Eng. R. R. Cases (Minn.) 264; *Barry v. Railroad*, 92 N. Y. 289; *Davis v. Railroad*, 58 Wis. 646; *Byrne v. Railroad*, 104 N. Y. 362; *Graves v. Thomas*, 95 Ind. 361; *Campbell v. Boyd*, 88 N. C. 129. (4) *First.* The courts

of the country are authorized to take judicial notice of the census returns. *Topeka v. Gillet,* 32 Kas. 437. *Second.* The United States census for 1880, volume 1, page 203, reports the population of Pleasant Hill in 1880 at twenty-three hundred and seventy-two inhabitants. *Third.* Greater care and caution are required of railroad companies in handling their trains in a populous city than in the country. *Brown v. Railroad,* 50 Mo. 467; *Maher v. Railroad,* 64 Mo. 276; *Hicks v. Railroad,* 64 Mo. 439; *Harlan v. Railroad,* 65 Mo. 24; *Frick v. Railroad,* 75 Mo. 609. (5) It is negligence *per se* for a railroad company, when approaching a crossing, to make a running or flying switch. Defendant was violating its duty in this respect in the case at bar at the time plaintiff was injured. *Brown v. Railroad,* 32 N. Y. 597; *French v. Railroad,* 116 Mass. 537; *Hinckley v. Railroad,* 120 Mass. 257; *Butler v. Railroad,* 28 Wis. 487; *Railroad v. Troutman,* 6 Am. & Eng. R. R. Cases (Pa.) 122; 1 Rorer on Railroads [1 Ed.] p. 491, sec. 3, and cases cited. (6) If the court should hold that the place where plaintiff was injured was a public crossing, and that defendant failed to give any signal as required by section 2608 of the Revised Statutes of 1889, then it devolved upon defendant to show that plaintiff was not injured by reason of its failure to give any signal. This it signally failed to do, and plaintiff was entitled to recover as a matter of law. *Ernst v. Railroad,* 35 N. Y. 27; R. S. 1889, sec. 2608. (7) Plaintiff had the right to assume that defendant in handling its cars would act with appropriate care; that the usual signals of approach would be seasonably given, and that the managers of the train would be attentive and vigilant. Defendant signally failed to comply with the foregoing requirements, and was, therefore, guilty of negligence, which directly contributed to plaintiff's injury, and plaintiff was free from contributory negligence. *Donohue v. Railroad,* 91 Mo. 363 and 364, and cases cited;

*Ernst v. Railroad*, 35 N. Y. 27; *Petty v. Railroad*, 88 Mo. 318; *Johnson v. Railroad*, 77 Mo. 546; Shearman & Red. on Neg. [3 Ed.] sec. 31; *O'Connor v. Railroad*, 94 Mo. 157; *Kennayde v. Railroad*, 45 Mo. 261; *Tabor v. Railroad*, 46 Mo. 356; *Loucks v. Railroad*, 31 Minn. 534; *Reeves v. Railroad*, 30 Pa. St. 454; *Langhoff v. Railroad*, 19 Wis. 489. (8) Where the evidence is undisputed, and fair-minded men of ordinary intelligence might honestly differ as to whether or not such facts show negligence upon the part of defendant, then it is peculiarly a question for the jury, and the court has no right to dispose of the matter as a proposition of law. *Kennayde v. Railroad*, 45 Mo. 225; *Norton v. Ittner*, 56 Mo. 351; *Mauerman v. Siemerts*, 71 Mo. 101; *Petty v. Railroad*, 88 Mo. 316; *Huhn v. Railroad*, 92 Mo. 450; *Tabler v. Railroad*, 93 Mo. 85; *Chouteau v. Iron Works*, 94 Mo. 399; *Stephens v. Railroad*, 96 Mo. 212; *Wagner v. Railroad*, 97 Mo. 523; *Barry v. Railroad*, 98 Mo. 71; *Weber v. Railroad*, 100 Mo. 201; *Adams v. Railroad*, 100 Mo. 570 and 571. (9) The damages in this case are not excessive. *Berg v. Railroad*, 50 Wis. 419; *Railroad v. Mackey*, 22 Am. & Eng. R. R. Cases (Kansas) 306; *Ferguson v. Railroad*, 19 Am. & Eng. R. R. Cases, 285; *Railroad v. Dorsey*, 25 Am. & Eng. R. R. Cases (Texas) 446; *Dougherty v. Railroad*, 97 Mo. 648; *Railroad v. State*, 12 Am. & Eng. R. R. Cases, 149; *Whalen v. Railroad*, 60 Mo. 323; *Pry v. Railroad*, 73 Mo. 124; *Waldheir v. Railroad*, 87 Mo. 37. (10) The jury in the first trial returned a verdict for $10,000, Defendant under the reversal of this court obtained another trial before a different jury and a verdict for $15,500 was returned. As the defendant has had two trials before different juries, this court should not award a third trial for excessive damages. *Goetz v. Ambs*, 22 Mo. 170; s. c., 27 Mo. 33 and 34; *Porter v. Railroad*, 71 Mo. 68.

GANTT, P. J.—This is an action for damages for personal injuries. At the time plaintiff was hurt he

was attempting to pass between the cars standing on the house or storage track of defendant's railroad in Pleasant Hill, Missouri. The charge in the petition is that defendant, without warning, violently forced its cars together, just as plaintiff was passing through, and the fleshy portion of his leg, from his thigh down, was bruised and mashed. The answer was a general denial and contributory negligence.

Negligence is a relative term. In every action for negligence of another there must be shown to exist some obligation or duty towards the plaintiff which the defendant has left undischarged or unfulfilled. So in this case the important question arises at once, what duty did defendant owe the plaintiff in protecting and guarding him at this crossing at the time he was hurt, and what were their relative rights and obligations with respect to each other? On the one hand, plaintiff maintains with great earnestness that this was a public crossing, and that defendant owed it to plaintiff to ring the bell upon its engine or sound its whistle before attempting to close said crossing with its cars. On the other hand, defendant urges that this was in no sense a public crossing; that no street or highway of any character crossed its track at this point; that its duty to ring the bell or sound the whistle was statutory, and had never been extended beyond the duty imposed by the statute; that all that could be affirmed under the evidence was that plaintiff was a licensee; that defendant had permitted footmen to pass over its track at this point when not blocked by its cars without protest; that none of the statutory obligations devolved upon it with reference to this crossing; that plaintiff, having lived for many years in Pleasant Hill, knew that this was simply a sidetrack on which defendant loaded and unloaded cars, and in so doing was constantly putting in and taking out cars, and knew that it was not the duty or custom of defendant to ring the bell or blow the whistle in moving its cars in and out on this track, and, so knowing,

recklessly exposed himself, without the knowledge of defendant. Inasmuch as a proper determination of the other questions in the case depends largely upon the ruling as to the character of this crossing, we proceed to examine this question.

F. D. Mers, a witness for plaintiff, testified he had lived in Pleasant Hill since 1867. In regard to this crossing he says: "The first sidewalk was put down in 1865. Two planks were put down by Mr. Brown, who then owned the Planters' House. It was called the 'Sherman House.' Two boards were put down to the depot. After they run awhile the railroad company put down a platform for the convenience of the passengers to go from the depot up to the eating-house. It was made out of wood. A plank walk has been maintained there since. * * * I don't know who paid for the walk, but I know the railroad company's men did the work. Mrs. Henry gave up the house, I think, in 1875. Then the eating-house was changed to the Atlantic hotel. When the walk got out of repair I fixed it myself. * * * I took it up myself, and put it down myself, or had it done, after the railroad company changed from my eating-house to the Atlantic. *Then, for my own convenience, I kept it in repair; that is what I did it for. The city would never do it.*" Over this walk, so maintained in the interest of the Planters' House, a hotel immediately in the rear, on the hill back of and behind defendant's depot, the people passed, *when* it was not blocked by the cars of defendant, without objection from defendant or its agents. This walk crossed this sidetrack that ran in the rear of defendant's station-house. This track was used for loading and unloading cars, and the defendant was constantly putting cars in and taking others off of this track.

Plaintiff was a commercial traveler of long experience in traveling on railroads. Was a man fifty-nine years of age. Had lived in Pleasant Hill since 1871,

and was well acquainted with the use to which this sidetrack was put. Some of the witnesses called this a *public crossing*, but they all agree that by this term public they mean simply that the citizens of Pleasant Hill were in the habit, many of them, of walking across from the Planters' House to the depot. None of them pretend there was a street or alley crossing defendant's track at this point. It was simply a footpath that had been used because it was some thirty steps nearer than the regular street crossings east or west of the depot. On the evening plaintiff was hurt the witnesses say that before dark there was a space of some three or four feet between the cars at this crossing. But the last witnesses who passed through before plaintiff was hurt say that the cars were so close that a man could barely get through; one, the last who passed, saying that "he had to turn sideways to get through." Plaintiff's son, who was with him, says he didn't think he could get through; that while his father was trying to get through he had his hands on the cars on either side of the crossing, and stood waiting to see if his father got through.

Now, what is meant by a *public crossing* in the instruction of the court and the brief of plaintiff? We take it, it can only refer to the public crossings mentioned in section 806, Revised Statutes, 1879; section 2608, Revised Statutes, 1889; because respondent in his brief insists that it was the duty of defendant to ring the bell or blow the whistle before its cars approached said crossing, and because it is well established in this state that it is only necessary to ring or whistle in approaching street or road crossings. *Dahlstrom v. Railroad*, 96 Mo. 99; *Stillson v. Railroad*, 67 Mo. 671. The statute requiring the bell rung or whistle blown at public roads or street crossings is a wise one. At these crossings the public have the right to cross at all hours, and it is but simple justice that, when a company

crosses these highways with powerful and dangerous engines, it should give warning to those whose duty or inclination may call them over these crossings; but it cannot, we think, be affirmed, with equal reason, that a company, in its own yards, moving its cars up and down on its storage tracks, and not across any public road or street, is required to use the same extraordinary care as in the case of street or road crossings. The licensee who enters upon a railroad track at points other than public roads or streets may by long acquiescence not be a trespasser; but it is going too far to say that, because he is not a trespasser, his rights become paramount to that of the company to use its tracks for the transaction of its business. It is not only the right of the company to use its tracks without hindrance, but its duty to the public requires expedition in the handling and transporting of freight. It would reverse the natural order of things to require the company, in its yards and on storage tracks, to be constantly watching for trespassers and licensees. We think it more consistent with the general law and sound policy to require those who leave the highways, and the protection given by the law at these public street crossings, to go across these railroads at these private crossings, to use the utmost care and diligence in looking after their own welfare. This we understand to be the law of this state. "The obligations, rights and duties of railroad companies, and travelers crossing them, are mutual and reciprocal, and no greater care is required of one than the other." *Stillson v. Railroad*, 67 Mo. 671.

When this cause was here on a former appeal, this court held that defendant had a perfect right to stand its cars on this sidetrack, and there was no foundation in this petition for any charge of negligence against defendant for leaving its cars unsecured. To this opinion we still adhere. *Gurley v. Railroad*, 93 Mo. 445. Under this evidence, then, we hold this was not a public crossing, within the meaning of section 2608, and the

argument of learned counsel based on this assumption is not tenable ; and we hold, moreover, that the instruction, numbered 2, given for plaintiff, permitting the jury to find this was a public crossing, was erroneous. It was misleading. While the public used this crossing by acquiescence of defendant as a footway, this use did not convert it into a public road or street crossing, within the meaning of the statute, and did not devolve upon the company the duty of maintaining it as a public crossing, and keeping it open and unobstructed, and visiting upon it the statutory penalties for failure so to do.

But, because it was not a public crossing, it does not follow that defendant might negligently and recklessly run its cars over persons who had been in the habit of crossing there. It has been repeatedly held by this court that greater care is to be exercised in running trains within the limits of towns and cities than is required in the country (*Frick v. Railroad*, 75 Mo. 595, and cases there cited), and that "a less degree of vigilance will ordinarily be required between the streets of a town or city than will be required at the street crossing, or when running longitudinally in a street ; but undoubtedly some vigilance is required even between streets, and the degree required will necessarily vary with the attendant circumstances." *Frick v. Railroad, supra.* And in that case it was held that, in the case of an adult, the court should qualify its instruction so as to direct the jury that the railroad company would only be liable in case its servants failed to exercise ordinary care to prevent the injury, after they became aware of the danger to which the traveler was exposed.

The relation of the plaintiff and defendant must be kept in view. This was not a public crossing. If it had been so, defendant would have owed plaintiff a positive legal duty ; but, being a mere private crossing, and plaintiff being a licensee only, defendant was bound not to recklessly injure plaintiff ; and, if it discovered him

on the track, then it was its duty to have used every precaution to prevent any injury to him. It is evident that plaintiff did not frame his petition on the theory that this was a public crossing. Had he done so, he would have charged the failure to ring the bell or sound the whistle, but there is no allegation of failure in this respect. If plaintiff seeks to recover on this ground, it is clearly his duty to allege the facts constituting the negligence. Learned counsel seemed to recognize the force of this objection to their petition, and seek to parry the effect of it, by insisting that the answer of defendant amounts to an "express aider," and cures the petition. The allegation which they claim has this effect is the averment in the answer that plaintiff was well acquainted with the use of this sidetrack, and knew that the defendant in using this track was in the habit of moving its cars in and off this track without giving these statutory signals. We do not think the answer had the effect of curing the petition. It was the averment of a general course of conduct by defendant from which plaintiff was advised of the danger of attempting at any time to cross this track. It is not an admission that no signals were given at the time plaintiff was hurt.

Conceding, then, this was not a public street or road crossing, and that plaintiff was there as a licensee, and not a trespasser, and that defendant owed him the duty to use ordinary care in discovering his presence on the track, we next inquire into plaintiff's own conduct as affecting his right to damages. Plaintiff had been a citizen of the city since 1871. He was a man fifty-nine years old ; a commercial traveler. He knew the premises well. Knew this was a side or storage track, constructed by the defendant to accommodate its freight business. He knew the defendant was constantly putting in and taking cars off of this track, in loading and unloading them. It must be taken, also, that the company was not in the habit of sounding the bells or

blowing the whistles whenever they put a car in or took one out of this switch. Plaintiff was apprised that daily and nightly cars were moved over this branch or switch track, just as the convenience and requirements of defendant's business demanded. These cars were not moved on any regular schedule time, but might be expected to move at any time without warning or signals. Knowing all this, plaintiff comes to this crossing in the night-time. Now, it may be conceded that if when plaintiff came there the cars were opened as if to invite the public to cross, and it was the custom of the defendant when it had finished its switching to leave an opening between the cars at this crossing for the public, then unquestionably it would be the duty of defendant to give some suitable or reasonable warning before closing the same, for the protection of those who used the crossing, and plaintiff might well have supposed it would be safe to cross if he was not otherwise advised that the defendant was about to close this gap or opening, and acting upon this invitation he would be protected; but is plaintiff in a position to avail himself of such a theory in this case? Caldwell, one of his witnesses, the last man who passed through this train before plaintiff was hurt, testifies that he met plaintiff between the Planters' House and the crossing, only a few yards distant, and when he came through the train he had to *turn sideways* to get through, so close were the cars. "I thought it was a dangerous place, the way those cars were standing there."

Symington, another of plaintiff's witnesses, testified in regard to the space between the cars: "I should judge just about room for a person to walk through; *barely room for a person to walk through.*" Hays Gurley, son of the plaintiff, who was with his father, testified: "My father went in between the cars before I did. When my father went through I was right behind him. At the time he was struck I just had my hands on the side of the cars, one hand on each car. I was

going through, if he got through all right. I concluded I could not get through. I thought I would get through if he got through all right." The other witnesses, who went along earlier than this, say the cars stood from three to four feet apart. Under these circumstances, common prudence and care required of plaintiff to look and ascertain whether he could safely pass through that train, and common prudence dictated that he should not recklessly expose himself to the danger of being crushed between those cars. Their very position was a warning to a man of ordinary prudence to stay out. The plaintiff's conduct savors of reckless rashness. It has long been held that the neglect of an engineer of a train to sound its whistle or ring its bell on nearing a street crossing does not relieve a traveler in the street from taking ordinary precaution for his safety; that he is bound to use his senses, to listen and look, in order to avoid any possible accident from an approaching train; and, if he fails to do so, he takes the risk. *Stillson v. Railroad*, 67 Mo. 671. *A fortiori* ought a traveler, in the night-time, crossing in the yards or on sidetracks, to be careful of his conduct. In *Stillson v. Railroad*, this court used this language: "The space left between the two trains, even when the father of plaintiff went over to the hotel, twenty inches, *would not indicate any invitation, even to foot-passengers*. There was no evidence in the case that any person other than the father of plaintiff and one other person had ventured to cross at that point, and it is clear that, if the father had preceded his child so as to observe the diminished size of the aperture, he would not have advised her to attempt a crossing; certainly if he observed the locomotive at the west end, and made an attempt to cross himself, or advised his child to attempt it, *its recklessness would have been obvious*. It does not appear that any officer or servant of the company was aware that plaintiff was proposing to cross."

In the recent case of *Hudson v. Railroad*, 101 Mo. 13, this court quoted with approval the language of the Maryland court in *State v. Railroad*, 31 Md. 366: "The fact that a train of cars is unlawfully blocking a crossing is no reason why a person should throw himself under the wheels or recklessly expose himself to danger."

In addition to the warning given by the proximity of the cars, plaintiff's other witnesses testify to the kicking in of the cars, and to the rattle and noise made by the cars as they came back from the west upon those near the crossing; and this is a matter of such general experience that it is hardly possible for plaintiff not to have heard these cars, had he used the common precaution of stopping before he went in between them. It is true that plaintiff says he stopped, looked and listened, and did not hear or see any cars moving; but the other witnesses are his also, and they testify to seeing the engine kick the cars on the switch, and to their movement and noise, continuously, up to the very moment plaintiff cried out. This evidence in connection with that of plaintiff's son that he stood there, and would not venture until he could see the result of his father's effort to cross, all goes to show that plaintiff acted in a reckless manner, and by his own negligence contributed to his own injury. If the warning was such that Caldwell thought it dangerous, and his own son stood back and would not attempt it, it ought to have been sufficient for plaintiff. By walking thirty steps further east, he could have crossed on a public street, with all the safeguards of the statute thrown around him for his protection.

The second instruction given for the plaintiff was erroneous in this: "Plaintiff's petition was not framed on the theory that this was a public crossing, and that he was entitled to have the bell rung or whistle sounded as required by the statute. It is evident it is based upon the facts, as alleged in the petition, that defendant had been in the habit of permitting footmen

to go and come across said track, and had been in the habit of separating their cars at this crossing for that purpose, and that at the time plaintiff was hurt the cars were so separated."

If the court intended by this instruction to submit to the jury this question of the company inviting the public to cross, it was very unfortunate in its language. We hold that it should have distinctly said to the jury that if the company was in the habit of making these openings for the public to pass over its track at this point, and when plaintiff came to this crossing these cars were so separated as to induce plaintiff and the public to believe the company intended they should use it for a crossing, and he did so believe, then plaintiff was justified in acting upon this implied invitation, and defendant owed it to him, under such circumstances, to give him some reasonable or suitable warning of its intention to close this opening, and it would be liable to plaintiff if it neglected so to do. On the other hand, the court should have said to the jury that, if the company had placed its cars in such close proximity that it was dangerous or hazardous for anyone to attempt to pass between them, and it would appear to a reasonably prudent man that the company did not intend the public should use said opening as a crossing, then the implied invitation to pass was revoked, and plaintiff was not justified in risking himself between the cars at said crossing. This was a question for the jury, under the evidence and proper instructions. But this instruction was also erroneous in leaving it to the jury to say this was a public crossing. This was a misnomer and misleading. It allowed the jury to visit all the penalties for negligence at a public crossing. It is also erroneous in not requiring these various acts of defendant resulting in plaintiff's injury to have been negligently done ; and in not requiring plaintiff himself to have been free from negligence directly contributing to his injury.

As this case must be retried, we must remark here that we have not been able to understand how plaintiff could have received the wound he did in the manner he details it. How a man of ordinary stature, walking between two ordinary freight cars, could have the fleshy portion of his leg, from his thigh down, eight or nine inches, mashed by the bumpers or drawheads, is beyond our comprehension. We regard this statement, as appears in this record, so contradictory to general knowledge that no court is bound to accept it. In the case of *Hunter v. Railroad*, 23 N. E. Rep. 9, in an action against a railroad company for personal injury by a brakeman who had struck his head against something while sitting on a box car, going through a tunnel, the negligence charged was not in giving plaintiff notice of a brick arch in the tunnel, which reduced its height to four feet, seven inches, above the top of the car. The supreme court took judicial notice that a man could not strike his head against an obstruction that distance above where he was sitting, unless he was nine feet high, and that no man was ever known to be nine feet high. To have received the wound the plaintiff did, in simply walking between the cars, if the cars were the ordinary freight cars, plaintiff must have been of remarkable stature. It may be, on another trial, some intelligent explanation can be given how this wound could have been made; there is certainly none in this.

One other point only remains to be noticed. If plaintiff is entitled to recover at all, the verdict herein is excessive. It is in evidence that no bones were broken; no muscles destroyed. Plaintiff was able in eight or nine months to resume his work as a commercial traveler. We are asked by counsel to make the proper deduction, and they will remit. We are aware that this court has in cases heretofore indicated how much should be remitted, but, speaking for ourselves, we think that, whenever the verdict does not upon its face appear to be the result of passion or prejudice, it is

wholly within the province of the jury; but when it does so appear, then it ought to be set aside. We have no scales by which we can determine what portion is just, and the result of reason, based upon the evidence, and what part is poisoned with prejudice and passion. We do not think it within our province to assess the damages. When we set aside any part of the verdict, we destroy its integrity, and we have no right to set ourselves up as triers of facts, and render another and different verdict. We think the only logical course in such cases is to let the verdict stand or set it aside as an entirety. For these reasons we reverse the judgment, and remand the cause. All the judges of this division concur.